**TECHSNABEXPORT, LTD.,**
**et al., Plaintiffs,**

**v.**

**The UNITED STATES,**
**et al., Defendants,**

**and**

**AD HOC Committee of Domestic Uranium Producers, et al., Defendants–Intervenors.**

**Court No. 92–04–00248.**

United States Court of International Trade.

Sept. 25, 1992.

Hogan & Hartson, William A. Bradford, Jr., Lewis E. Leibowitz, Steven J. Routh and T. Clark Weymouth, Frank J. Fahren-

---

**1.** This figure is derived from Smith Corona's data. For certain products, the home market may have reached the 5% mark.

kopf, Jr., of counsel, for plaintiffs Techsnabexport, Ltd., NUEXCO Trading Corp. and Globe Nuclear Services and Supply GNSS.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Neil R. Ellis, Susan M. Matthews and Elizabeth Hafner for plaintiffs Ukraine, Republic of Kyrgyzstan, and Republic of Tajikistan.

Coudert Brothers, Mark D. Herlach, Matthew P. Jaffe, and Nathan V. Holt for plaintiffs Russian Federation.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, U.S. Dept. of Justice, Civil Div., Marc E. Montalbine, David W. Richardson, Attorney–Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel, for defendants.

Akin, Gump, Hauer & Feld, Valerie A. Slater, Nicholas D. Giordano and Anne L. Doherty, for defendants-intervenors.

## OPINION

RESTANI, Judge:

This action challenges the determination of the United States Department of Commerce, International Trade Administration to continue an antidumping duty investigation of uranium products from the Union of Soviet Socialist Republics following dissolution of that political entity. The determination is challenged by four of the six republics whose uranium exports likely will be the subject of any resulting antidumping duties. They are Kyrgyzstan, Russia, Tajikistan, and Ukraine.[1] The determination is also challenged by the companies involved in the exportation of uranium from the plaintiff republics. Those entities are collectively referred to as TENEX.

## FACTS

The background of this action is discussed in the court's decision denying preliminary relief in this matter. *See Techsnabexport, Ltd. v. United States*, 16

CIT ——, 795 F.Supp. 428 (1992). Of particular note is the following chronology:

November 19, 1991 International Trade Commission ("ITC") notice of investigation of *Uranium from the U.S.S.R.*, 56 Fed.Reg. 58,397 (1991).

December 5, 1991 Commerce's *Initiation of Antidumping Duty Investigation: Uranium from the Union of Soviet Socialist Republics*, 56 Fed. Reg. 63,711 (1991).

December 23, 1991 ITC preliminary affirmative injury determination, *Uranium from the U.S.S.R.*, Inv. No. 731–TA–539, 57 Fed.Reg. 68 (1992) (preliminary).

December 25, 1991 U.S.S.R. is dissolved and President Bush recognizes the twelve republics that formerly comprised U.S.S.R. as independent states.

January 10, 1992 TENEX requests termination of investigation.

March 24, 1992 Commerce announces intention to continue investigation.

April 9, 1992 Ukraine and Tajikistan initiate their action followed by a separate action by TENEX; the actions are then consolidated.

May 21, 1992 Preliminary injunctive relief denied.

June 3, 1992 Commerce issues *Uranium from Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine, and Uzbekistan;* and *Uranium from Armenia, Azerbaijan, Byelarus, Georgia, Moldova, and Turkmenistan*, 57 Fed. Reg. 23,380 (1992) (preliminary determination of sales at less than fair value).

June 10, 1992 Russia files suit.

June 17, 1992 ITC files notice of initiation of final investigation as to *Uranium from Kazakhstan, Kyrgyzstan, Russia, Tajikistan, Ukraine, and Uzbekistan*, 57 Fed.Reg. 27,065 (1992).

June 22, 1992 Kyrgyzstan files action.

July 17, 1992 Last two actions are consolidated with the earlier suit.

---

**1.** Uzbekistan also has challenged the determination, but its action has not been consolidated

with this action.

September 10, 1992 ITC announces intention to continue investigation.

## JURISDICTION

Although the court dealt with the question of jurisdiction in some detail in *Techsnabexport*, defendant again raises this ground for dismissal of the action. Jurisdiction is an issue that may be raised at any time, and defendant has presented new arguments in support of its previously stated position of no jurisdiction. Initially, defendant argued that *Asociacion Colombiana de Exportadores v. United States*, 13 CIT 584, 717 F.Supp. 847 (1989), *aff'd on other grounds*, 903 F.2d 1555 (Fed.Cir. 1990) and *Carnation Enter. Pvt. Ltd. v. United States*, 13 CIT 604, 719 F.Supp. 1084 (1989), in which jurisdiction was based on 28 U.S.C. § 1581(i), were indistinguishable from the case at hand. Defendant, instead, requested the court to find the reasoning of those cases erroneous. The court declined to do so. Defendant now argues those cases are distinguishable from the one at hand. The Ad Hoc Committee of Domestic Uranium Producers raised similar arguments at oral argument prior to the previous opinion. The court was aware of differences among the cases that might provide a basis for distinguishing them; it did not consider those differences significant enough to change the result in this case. Thus, defendant has not presented an argument sufficiently new to compel the court to reexamine its previous analysis.

As to the argument raised by defendant that the court would have jurisdiction if Commerce were acting in a manner clearly outside its authority, this simply begs the question of what is Commerce's authority in this matter. Thus, the court has no alternative but to address the substance of this action. Nonetheless, the issue is quite narrow. The court may not address at this stage whether Commerce's decisions on adjustment of its proceedings to the relevant geopolitical events are consistent with the statute and supported by substantial evidence. *See Techsnabexport*, 16 CIT at ——, 795 F.Supp. at 435 (discussing exhaustion of administrative remedies). Nor is the court concerned with Commerce's preliminary determination, which is discussed by both sides, although the preliminary determination reflects Commerce's earlier decision to proceed.[2] The issue before the court is whether Commerce may continue an antidumping duty investigation initiated as to uranium exports from the U.S.S.R. after the U.S.S.R. is dissolved, when the investigation may result in the imposition of duties on uranium exports of certain now independent republics.[3]

## ARGUMENTS

There is very little in the actual language of the unfair trade laws, or the regulations promulgated thereunder, which would provide an answer to the issue before the court. Rather, both sides make their arguments largely based on the overall structure of the relevant statutory scheme and by reference to tangentially related provisions of the statute. For its part, the defendant argues that discontinuation of the investigation would create an impermissible gap in statutory coverage resulting from termination of the ongoing investigation and commencement of a new and later investigation. During this period and the period needed to complete the new preliminary investigation, unfair imports could enter unimpeded and undutied.[4] Defendant also argues that the focus of the law is merchandise, not countries, and the merchandise at issue is from production facili-

---

**2.** There is no jurisdiction to review the various methodological determinations reached in an affirmative preliminary determination. 19 U.S.C. § 1516a(a)(2)(B) (1988) (setting forth reviewable determinations).

**3.** The preliminary determination resulted in the requirement of substantial deposits to cover projected antidumping duties on uranium from six republics, including the plaintiff republics.

**4.** Pursuant to 19 U.S.C. § 1673b(d)(1), liquidation of entries is suspended and deposits of duties are required following an affirmative preliminary determination. 19 U.S.C. § 1673b(d)(1) (1988). If critical circumstances are found, entries during the previous ninety days will also be affected. 19 U.S.C. § 1673b(e)(1)–(2) (1988).

ties that existed before and after dissolution.

Plaintiffs, on the other hand, argue that Commerce may only investigate and issue antidumping orders with regard to exports from a particular country. They argue further that by conducting the investigation without a new notice of initiation of investigation as to the plaintiff republics, Commerce has violated the statute and deprived them of procedural protections conferred by the statute. A corollary argument is that the antidumping laws are not punitive and that antidumping duties are imposed based on projected future conduct. Because the previous sovereign state with its centrally controlled nonmarket economy has been dissolved, plaintiffs argue that the behavior of the new states, with their fledgling market economies and more independent producers and exporters, cannot be predicted from past behavior. Thus, punitive duties are inappropriate.

## DISCUSSION

■ The actual intent of the statutory scheme lies somewhere between the arguments of the opposing litigants. The statute does indeed deal with merchandise, first and foremost, but generally investigations are to focus on merchandise from particular countries. There are special mechanisms to deal with multinational corporations (*see* 19 U.S.C. § 1677b(d) (1988)) or multinational effects (*see* 19 U.S.C. § 1677(7)(C)(iv)(I) (West.Supp.1992)). Again, at the conclusion of the process, antidumping orders must address merchandise from particular countries, if for no other reason than for simple administrative needs; in other words, the Customs Service must identify the relevant merchandise to be dutied upon entry.

The statute requires that antidumping duties be imposed if "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value" and if the merchandise is injuring the domestic industry. 19 U.S.C.

§ 1673 (1988). The parties seem to be in agreement that a mere change in government,[5] even a change that would cause a transition from a nonmarket economy to a market economy would not require Commerce to terminate its investigation of the class of merchandise at issue. Under the statutory scheme, Commerce would look at the facts in existence during the investigatory period and would leave an examination of the new factual setting to any administrative review which is subsequently requested. *See* 19 U.S.C. § 1675 (1988).

If a country no longer has a nonmarket economy and has eliminated dumping, it may demonstrate this during the first annual review before final assessments of duties are made. Thus, the statutory scheme would seem to require that the court not concern itself with the new economic policies of respondent countries. It is, therefore, not persuasive that the centrally controlled structure, which set the export prices under investigation, has been dissolved. If a switch was made from a market economy to an nonmarket economy, surely the economics-based argument that the proceedings should cease would fail. The court sees no merit to the argument in the context of an economic change in the opposite direction.

■ Commerce's decision not to terminate is based on the notion that merchandise was imported and a petition was filed with respect to that merchandise. The merchandise did not evaporate upon dissolution of the Soviet Union. Commerce's view is that to terminate the investigation would cause a gap in statutory coverage which Congress did not intend, and the allegedly offending merchandise would escape scrutiny. Dissolution of a country, as opposed to mere change in government, is a rare enough event so that Commerce might have construed the statute to permit a gap in this instance, but its construction of the statute is not unreasonable and may indeed be the better construction. Contrary to plaintiffs' arguments, the statute

---

**5.** This is to be contrasted with the situation at issue, which resulted in wholesale redrawing of national boundaries.

provides no clear answer as to the result that must follow if a country dissolves mid-investigation.[6]   Reasonable interpretation of a statute by the agency which administers it must be upheld.   *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

In spite of the various references to "country" in the statute, there is no express requirement that the same "country" exist at the beginning of an investigation as at the end.   It is not unreasonable for Commerce to determine that, in order to fully effectuate the antidumping laws, imports from successor countries may bear the duties calculated based on the imports from the predecessor nations.[7]   Commerce will have to decide if it can adequately adjust to the geopolitical changes so as to keep the process fair and the result administrable, but those decisions may be reviewed at the end of the process, not at this stage.

As indicated, the plaintiff republics object to the short-circuiting of the statutory procedures with respect to them, in that they were not in existence at the time Commerce initiated the proceedings at issue.   The court has already found that the initial notice of the investigation was constitutionally adequate.   *See Techsnabexport,* 16 CIT at ——, 795 F.Supp. at 436–37. Notices of continuation at both Commerce and ITC referenced the republics which then comprised the Soviet Union.   Although unionwide data was used at the outset, presumably the republics have been given the opportunity to provide republic-

specific data.   If presented with the question, the court will decide in conjunction with review of the final determination whether the opportunity given was statutorily sufficient.   The court points this out merely to indicate that it decides today that the simple fact of country dissolution need not compel termination of an investigation, and that more complicated issues of methodology and procedure are not addressed.

The Russian Republic has insisted since the outset that Commerce's preliminary determination is invalid as to it, without a country-specific injury finding as required by GATT and the statute which implements it domestically.   19 U.S.C. § 1673b(b)(1)(A) requires an ITC affirmative preliminary determination before Commerce may issue its preliminary determination.   As the court has indicated, it is not reviewing Commerce's preliminary determination.   Nor are ITC's preliminary or final determinations before the court.   In any case, ITC's preliminary determination was issued with respect to the Soviet Union because the Soviet Union existed at that time.   Later dissolution of the Soviet Union would not seem to be a basis in itself for invalidating the preliminary *ITC* determination.   Furthermore, in *Ferrosilicon from Argentina, Kazakhstan, the People's Republic of China, Russia, Ukraine and Venezuela,* USITC Pub. 2535, Inv. Nos. 303 TA–23, 731–TA–565–570 (July 1992) (preliminary), ITC decided it could examine merchandise exported from the U.S.S.R. because the very same factories produced the exported merchandise at issue as to the republics.[8]

**6.** The court does not find the references to countervailing duty investigations, which concern governmental subsidization, or the procedures for selection of the surrogate country for a nonmarket economy country in the actual margins calculation process, relevant to this discussion.   Countervailing duty investigations necessarily involve the actions of particular governmental entities, and surrogate country procedures are merely the particular mechanism selected by Congress for calculating margins in nonmarket economy cases.   These provisions do not address the fundamental questions at issue here.

**7.**   The court appreciates the parties' attention to the issue of the obligations of successor coun-

tries.   Upon reflection, it would appear that a successor nation's obligations with respect to international agreements (*see Restatement (Third) of the Foreign Relations Law of the United States,* § 210 (Comment f) (1986)), or any other obligation of a sovereign would not be relevant.   The legal responsibility for duty payment lies with the importer, and current obligations are based upon margins established with respect to past imports.

**8.**   ITC held in that case:
If the Commission were to accept respondents' argument that it cannot even consider imports from these regions prior to the time they became countries, that might prevent an industry otherwise entitled to relief from re-

Similarly, whatever the change in boundaries, in this case ITC examined the effects of the same merchandise which is of concern to Commerce. Thus, there is no reason to presume ITC will rescind its preliminary determination. In fact, it has determined that it will proceed to a final determination.

Moreover, in ITC injury determinations imports are commonly cumulated across political boundaries for the purpose of assessing volume and price effects. 19 U.S.C. § 1677(7)(C)(iv)(I) (West Supp.1992). The Russian Federation does not argue any facts which are so startling that they would warrant, in this context, the court's consideration of the effects of merchandise produced within Russia separately from the merchandise produced within the boundaries of the other republics. This is an issue for ITC to consider in the first instance. It is not now before the court.

## CONCLUSION

While dissolution of the Soviet Union produced a difficult problem for the agencies required to administer the antidumping laws, the statute does not compel termination of the investigation based solely on the mid-investigation dissolution. Whether Commerce and ITC adjusted their procedures properly in the face of this change may be addressed in the context of review of the final ITC and Commerce determinations.

Commerce's determination to proceed is sustained.

ceiving any protection from unfairly traded imports from the same factories that are allegedly continuing to export dumped ferrosilicon to the United States simply because the political status of these areas has changed. The occurrence of other events changing the legal status of a foreign producer during the period of investigation, such as a change in ownership of the facility or the imposition of an export quota by the country in question, would not preclude the Commission from considering the consequences of the product

that had been exported to the United States prior to such an event....

[I]t would seem to be a far more reasonable exercise of the Commission's discretion to fill in the lacunae in the statute to conclude that the Commission could consider imports that originated in *each area* prior to its becoming a country in making injury determinations. *Ferrosilicon,* USITC Pub. 2535, Inv. Nos. 303 TA–23, 731–TA–565–570 at 13–14 (July 1992) (emphasis added).